**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Bennett, | No. CV-16-03908-PHX-ROS |
|        Plaintiff, | **SEALED ORDER** |
| v. | |
| GoDaddy.com LLC, | |
|        Defendant. | |

Plaintiff Jason Bennett received calls on his cellular phone from Defendant GoDaddy.com, LLC. Plaintiff believes those phone calls were "telemarketing calls" prohibited by the Telephone Consumer Protection Act ("TCPA"). Plaintiff now seeks to certify a class of approximately ███ individuals who received similar calls on their cellular phones. GoDaddy opposes class certification, primarily arguing each call was unique and the Court would have to conduct "individualized inquiries" to determine which of the calls qualified as "telemarketing." Class certification is not the proper time to delve too deeply into the merits of Plaintiff's claim. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). And the inquiry into the purpose of particular calls must be done with "a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Class certification is appropriate.

## BACKGROUND

Defendant is "the world's largest technology provider dedicated to small businesses

with over 17.5 million customers worldwide." (Doc. 123-1 at 3). Defendant provides web-based products and services, such as domain name registration and website hosting. Plaintiff is a small business owner who, sometime prior to September 2015, purchased services from Defendant. (Doc. 122-1 at 46). In doing so, Plaintiff provided a contact number. Plaintiff later updated his contact number to his cellular number. Plaintiff did not provide express written consent that Defendant could make telemarketing calls to his contact number. Despite the absence of consent, Defendant placed two calls to Plaintiff's cellular telephone line.[1] The parties disagree on why those calls were made. To understand why the legality of those two calls presents common issues, the Court must explore Defendant's operations in some detail.

## I.  Defendant's Operations

Defendant describes its ███████████████████████████████████████████ ████████████████████████████████████████ (Doc. 123-1 at 3). Defendant refers to its ██████████████ as the "Customer Development Team" or "CDT." (Doc. 123-1 at 2). ████████████████████████████████████ Defendant believes it is inaccurate to view the CDT as primarily engaged in sales but ██████████████████████████████████████████████████[2]

According to a job posting for a position with the CDT, Defendant considered it an "inside sales team." The job posting described the position as "an outbound sales position, calling our existing customers to discuss their products and services." (Doc. 122-1 at 24).

---

[1] Defendant made more than two calls to Plaintiff's cellular phone but only two of those calls are relevant for purposes of class certification.

[2] Defendant points out that many of the documents regarding ████████████ ██████████ post-date the time Plaintiff received the relevant calls. Defendant does not offer evidence, however, that the documents present an inaccurate depiction of ████ ████████████████████████ at the relevant time. Therefore, the evidence offered by Plaintiff provides substantial insight into ████████████████████████████████ ████████ at the time Plaintiff received the calls. If that evidence is not from the relevant time period, the evidence may or may not be admissible at trial. The Court is free, however, to consider the evidence at this stage, even if it is ultimately deemed inadmissible. *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) (holding inadmissible evidence may be considered at class certification stage).

In describing who should apply, the job posting stated "applicants with a very strong sales background [would be] contacted first." In addition, applicants were expected to have the "[a]bility to close business sales." (Doc. 122-1 at 25).

Once an individual was hired for a position with the CDT, █████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████ (Doc. 122-1 at 19). ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████ (Doc. 122-1 at 19). ███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████ (Doc. 122-1 at 3). █████████████ ████████████████████████████████████████████████████████████████████ (Doc. 122-1 at 3). ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ (Doc. 122-1 at 5). ███████████████████████

[3] In opposing class certification, Defendant argues it does not ███████████ ████████████ (Doc. 123-1 at 5). █████████████████████████████████████████ ██████████████████ (Doc. 123-1 at 5). Defendant's semantic argument has little appeal ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

1  
2  
3  (Doc. 122-1 at 5).  
4  
5  (Doc. 122-1 at 5).  
6  
7  
8  
9  
10  (Doc. 122-1 at 6). (Doc.  
11  122-1 at 6).  
12  
13  
14  (Doc. 122-1 at 7).  
15  
16  
17  (Doc. 122-1 at 7).  
18  
19  (Doc. 122-1 at 8).  
20  (Doc. 122-2 at 28).  
21  (Doc.  
22  122-2 at 32).  
23  (Doc. 122-2 at 32).  
24  
25  
26  (Doc. 122-3 at 2).  
27  
28

1    ████████████████████████████████ ██████████████████████

2    ████████████████████████████████████████████

3    ███████████████████████████████████████

4       ██████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ████████████████████████████████████ (Doc. 122-2

11   at 13-14). ████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████ (Doc. 122-2 at 15). ████████████████

15   ████████████████████████████████████████████

16   ████████████

17   **II.     CDT Campaigns**

18      ████████████████████████████████ Defendant then tasks

19   its CDT members with contacting existing customers.  Those contacts are made through

20   ████████████████████ ██████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ██████████████████████████████████████████ (Doc.

24   123-1 at 7). ███████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████████████

27   ████████████████████████████████████████████

28   _____

[4] The parties have not defined these terms.

- 5 -

[REDACTED]

Defendant used the following criteria to compile the customer list for the [REDACTED]
[REDACTED]
[REDACTED]
[REDACTED]
[REDACTED] (Doc. 122-1 at 79). Neither party has explained how these criteria were applied in detail. Thus, it is unclear what aspect of each criteria, such as [REDACTED] was deemed relevant for purposes of this campaign. As for the [REDACTED] campaign, Defendant could not locate the criteria used "to generate the customer contacts lists for the [REDACTED] (Doc. 122-1 at 75). But given Defendant's general practices, Defendant must have applied specific criteria to generate the list of customers that CDT members would attempt to speak with under that campaign.

During each of the campaigns, Defendant's automated dialing system placed calls to the selected numbers. Defendant is adamant that these campaigns were not telemarketing. In making this claim, Defendant has to make a series of rather dubious assertions. Defendant first states that the [REDACTED]
[REDACTED] (Doc. 123-1 at 8). According to Defendant, just because the two relevant campaigns were named [REDACTED] and [REDACTED]
[REDACTED] does not mean the campaigns actually involved [REDACTED] or [REDACTED] Defendant claims the names are effectively irrelevant because it [REDACTED]
[REDACTED] (Doc. 123-1 at 8). It is, of course, possible that Defendant decided to refer to the campaigns as [REDACTED] and [REDACTED] campaigns even though the campaigns were not aimed at [REDACTED] But Defendant does not offer any explanation why it would use unnecessarily confusing names for the campaigns.

After disputing the relevance of the campaigns' names, Defendant next offers a claim that [REDACTED]



(Doc. 123-1 at 8).

(Doc. 123-1 at 8).

(Doc. 123-1 at 8).  The problem with these post-hoc explanations of the ▮ campaigns is that the explanations are in significant tension with ▮

As pointed out earlier, ▮

(Doc. 122-1 at 6).

(Doc. 122-1 at 6).  If the ▮ campaigns were, in fact, ▮

Overall, Defendant's view of the calling campaigns as involving ▮ is difficult to square with the underlying evidence.

## III.    Calls to Plaintiff and Procedural History

Plaintiff received two calls on his cellular phone from CDT members.  On January 27, 2016, Plaintiff received a call in connection with the ▮

Defendant has provided a transcript of that call:

> **Plaintiff**: This is Jason.
>
> **CDT Member**: Hey, Jason. How's it going? This is Jordan at GoDaddy.
>
> **Plaintiff**: Good. Is this a sales call?
>
> **CDT Member**: Well, we're calling about some products you have so I mean, however you want to take it.
>
> **Plaintiff**: I'm not interested if it's a sales call. If domain names are expiring or something like that --
>
> **CDT Member**: Well, you may be interested in – just so you know the call may be recorded or retained for quality and training purposes. We're calling in reference to the restore fee you had to pay last year on your hosting plan. We wanted to let you know that we do offer site backups now on your hosting plan so that we can start backing up your content for you on our end. And if you ever have a situation where a hosting plan expired or a site got hacked or anything like that we could restore the copies of it.
>
> **Plaintiff**: I'm good. I appreciate the call.
>
> **CDT Member**: Not a problem. Like I said, we just want to make sure you know it's available to you so you don't have to pay $150 next time.
>
> **Plaintiff**: Alright. Thank you.
>
> **CDT Member**: Bye now.

(Doc. 117-1 at 18).

Plaintiff was also contacted on May 6, 2016, pursuant to the ██████████ campaign. The transcript of that call is as follows:

> **CDT Member**: Hello. This is George with GoDaddy looking for Jason.
>
> **Plaintiff**: Yep.
>
> **CDT Member**: Hello Jason. I'm business consulting here at GoDaddy and trying to do a review here on your account. I do have to mention this call may be recorded and retained for quality and training --
>
> **Plaintiff**: Is this a sales call?
>
> **CDT Member**: Well, it's actually – we go over the account just to make sure that you have everything you need and you're

not paying for something that's not needed.

    **Plaintiff**: I'm good. Thank you.

    **CDT Member**: And while I'm getting a billing too [end of recording].

(Doc. 117-1 at 17).

Shortly after receiving those two calls, Plaintiff filed this suit in the Southern District of Alabama. (Doc. 1). The original complaint proposed a very broad class definition that, in general, sought to cover "[a]ll persons within the United States" who, during the two years preceding the filing of the complaint, received an advertising or telemarketing call on a cellular telephone line from Defendant. (Doc. 1 at 5). Defendant filed its answer and, shortly thereafter, filed a motion to transfer venue to Arizona. (Doc. 9, 17). Plaintiff did not oppose the transfer and the case was transferred to Arizona in November 2016. (Doc. 22).

After arriving in Arizona, the Court adopted the parties' proposed discovery schedule. That schedule allowed Plaintiff a substantial period of time for discovery related to class certification and contemplated a "shorter time frame in which to complete any merits discovery, as necessary." (Doc. 35 at 7). During the class certification discovery period Plaintiff amended his complaint. (Doc. 75). The amended complaint proposed a slightly narrower class definition than what was proposed in the original complaint. After multiple extensions, the parties completed class certification discovery and Plaintiff filed his certification motion.

Plaintiff's motion for class certification proposes a narrower class definition than what he had proposed in his complaint and amended complaint. Plaintiff now seeks certification of a class defined as:

> All persons within the United States to whom, from November 4, 2014 through October 19, 2016, Defendant initiated a call to his or her cellular telephone using an ▮▮▮▮▮▮▮▮ dialing system pursuant to D▮▮▮▮▮▮▮▮ call campaign and/or its ▮▮▮▮▮▮▮▮▮▮▮▮ campaign.

(Doc. 122 at 3). Plaintiff believes there are approximately ███ individuals covered by this definition. Defendant's opposition to the class certification motion raises a great number of arguments against certification. As explored below, while some of those arguments are plausible, some of the argument border on frivolous.

## ANALYSIS

As the party seeking class certification, Plaintiff "bear[s] the burden of demonstrating that [he has] met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Defendant's opposition to the request for class certification spends the vast majority of its time arguing Plaintiff cannot satisfy the requirements of Rule 23(b)(3). As for the four requirements of Rule 23(a), Defendant makes only half-hearted efforts to dispute some of them. Following Defendant's lead, the Court will address the Rule 23(a) in relatively brief fashion before turning to the core of Defendant's opposition.

### I.     Rule 23(a) Requirements

The four requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of representation. *Id.* The Court must conduct a "rigorous analysis" of each of these requirements. *Id.* "Frequently that 'rigorous analysis' will entail some overlap with the merits of the underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Notwithstanding that overlap, class certification is not the appropriate time to definitively resolve the merits. "Merit questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

### A.  Numerosity

To meet the numerosity requirement, Plaintiff must establish the proposed class is so large that joinder of all members would be impracticable. This "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of*

1    *the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980).  The present

2    class easily satisfies this requirement as the proposed class includes approximately █████

3    individuals.  The numerosity requirement is met.

4        **B.  Commonality**

5        The commonality requirement specifies Plaintiff must show "there are questions of

6    law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This "language is easy to

7    misread, since any competently crafted class complaint literally raises common

8    'questions.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).  "What matters,"

9    therefore, "is not the raising of common 'questions'—even in droves—but, rather the

10   capacity of a classwide proceeding to generate common *answers* apt to drive the resolution

11   of the litigation."  *Id.*  That is, there must be at least one "common contention" that "is

12   central to the validity" of the claims and that can be resolved "in one stroke."  *Id.*

13       In this case, there are at least two common questions which can be resolved in one

14   stroke and that will drive the resolution of the litigation.  The first common question is

15   based on the fact that TCPA liability attaches only if Defendant used "an automatic

16   telephone dialing system" as defined by statute and regulation.  47 U.S.C. § 227(a)(1).

17   Defendant used the same dialing system to call Plaintiff and all putative class members.

18   Accordingly, determining whether Defendant's dialing system was "an automatic

19   telephone dialing system" is a question crucial to the validity of the putative class's claims

20   that can be resolved in one stroke, based on the same evidence for everyone.  Accordingly,

21   the minimum requirement that there be at least one "common question" is easily met.

22       The second common question involves the purpose for which calls to Plaintiff and

23   the class members were made.  The TCPA prohibits initiating calls to cellular telephone

24   lines, without express written consent, "for the purpose of encouraging the purchase or

25   rental of, or investment in, property, goods, or services, which is transmitted to any

26   person."  47 C.F.R. § 64.1200(f)(12).  As explored in more detail below, the purpose for

27   Defendant's calls to all class members is susceptible to being resolved in a single stroke,

28   based on the same evidence.

Because there are two common questions that can generate answers that will drive the resolution of the litigation, the commonality requirement is met.

### C. Typicality

"The test of typicality is whether other members have the same or similar injury [as the Plaintiff], whether the action is based on conduct which is not unique to [Plaintiff], and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). This does not require Plaintiff and the class members be "substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). It is enough if Plaintiff's claims are "reasonably coextensive with those of absent class members." *Id.* Typicality also requires the Court ensure Plaintiff is not "subject to unique defenses which threaten to become the focus of the litigation." *Id.*

Plaintiff and all putative class members suffered the same injury based on the same conduct by Defendant in the form of unauthorized calls to their cellular telephone lines. *Van Patten v. Vertical Fitness Grp.*, LLC, 847 F.3d 1037, 1043 (9th Cir. 2017) (concluding a plaintiff had standing to pursue TCPA claims because "[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients"). There are no relevant differences between Plaintiff's claims and the putative class members' claims. *Cf. Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) ("Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose . . . ."). Therefore, Plaintiff has satisfied the typicality requirement.

Defendant presents two arguments against typicality, neither of which is convincing. Defendant first argues Plaintiff is not typical because he was "well-versed in the TCPA prohibitions and requirements in the years leading up to this lawsuit." (Doc. 123 at 34). According to Defendant, Plaintiff knows more about the TCPA than the putative class members and that means he cannot satisfy the typicality requirement. Defendant cites no authority holding that an individual is not "typical" merely because he is more knowledgeable than the typical class member.[5] Plaintiff's knowledge regarding

---

[5] Defendant cites *Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 382 (C.D. Cal.

the TCPA does not render him atypical.

Defendant's second argument against typicality is that Plaintiff is subject to a unique defense. According to Defendant, the TCPA does not prohibit telemarketing calls to "business lines" and Plaintiff received calls on a line Plaintiff holds out to the public as the telephone number of his business. Thus, Defendant believes Plaintiff will be subject to the unique "business line" defense. As explored below, however, the TCPA forbids all calls to cellular telephone lines, regardless whether those lines are also used for business purposes. Therefore, Plaintiff is not subject to a unique defense. Plaintiff has satisfied the typicality requirement.

## D. Adequacy of Representation

The final Rule 23(a) requirement is that Plaintiff and his counsel be willing and able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires answering two questions: "(1) Do [Plaintiff and his counsel] have any conflicts of interest with other class members, and (2) will [Plaintiff and his counsel] prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Plaintiff and his counsel have pursued discovery and vigorously litigated Plaintiff's claims up to this point. There is no evidence that Plaintiff and his counsel have a conflict of interest with other class members. Rather, all indications are that Plaintiff and his counsel will fairly and adequately protect absent class members.

Defendant's only argument against adequacy is that Plaintiff and his counsel have decided not to try to obtain certification of the broadest possible class. Defendant believes the decision to narrow the class definition to ▮▮ campaigns, instead of all calls handled by CDT members, means Plaintiff has "an inherent conflict between himself and the members of the proposed class, some of whom may have received calls in one of the [other]

2016), in support of their position that a knowledgeable plaintiff may not qualify as typical. The analysis in that case, however, turned on the plaintiff being subject to unique defenses. Thus, the *Nghiem* court determined class certification was not appropriate because "[t]he major focus of this litigation will be on [the] issues and defenses unique to [the plaintiff], not on the claims of the class." *Id.* at 382-83.

campaigns" conducted by CDT members.  (Doc. 123 at 36).  Defendant has not cited any authority that a representative plaintiff must pursue the broadest possible class definition.[6] Plaintiff's decision to pursue a narrow class of individuals allegedly harmed by Defendant does not render him or his counsel inadequate to represent the class.

## II.        Rule 23(b)(3) Certification

Having met the four requirements of Rule 23(a), Plaintiff must also meet the requirements of one of the subdivisions founds in Rule 23(b).  Plaintiff seeks certification primarily under Rule 23(b)(3).  That subsection requires Plaintiff show his proposed class satisfies two conditions: 1) "common questions must predominate over any questions affecting only individual members," and 2) "class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).

### A.  Predominance

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016).  This requires the Court "give careful scrutiny to the relation between common and individual questions in a case."  *Id.*  This scrutiny involves identifying the "common questions" as well as the "individual questions" and determining which of the two will be more important to resolving the case.  Common questions are those "where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Id.*  Individual questions are those where class members "will need to present evidence that varies from member to member."  *Id.*  A

---

[6] Defendant cites a decision by the Ninth Circuit where the plaintiff and his counsel did not satisfy the adequacy requirement.  *Drimmer v. WD-40 Co.*, 343 F. App'x 219, 221 (9th Cir. 2009).  That decision was based on strange facts where the plaintiff and his attorney were "close friends" and the attorney was also the plaintiff's landlord.  The Ninth Circuit concluded that relationship raised concerns the plaintiff's decisions would "not be based on the best interests of class members, but on the best interests of his attorney."  *Id.*  There is no evidence that Plaintiff and his counsel have anything similar to that type of relationship.

class can be certified only when the common questions "are more prevalent or important" than the individual questions. *Id.* A class can be certified even if some crucial issues will require individualized proof. For example, the prospect of individualized damages inquiries is not necessarily enough to defeat certification. *Id.*

Defendant's opposition begins by conceding that one of the major questions in the case should be deemed a common question. Defendant states "whether the Cisco dialer used to place the challenged calls constitutes an 'automatic telephone dialing system' under the TCPA can be resolved by common evidence." (Doc. 123 at 13 n.1). Accordingly, there is at least one common question to be factored into the predominance inquiry.

After conceding the nature of the dialer presents a common question, Defendant argues the remaining important issues should be deemed individual questions. Defendant believes two of the most important questions will be whether each call to a class member constituted "telemarketing" and whether each call was placed to a telephone line that "qualifies for protection under the TCPA." (Doc. 123 at 12). Defendant believes both of these questions will require evidence that varies from individual to individual. Defendant's presentation of these questions, however, is based on misunderstanding the relevant provisions of the TCPA.

### i. What Calls Constitute Telemarketing?

The TCPA and the Federal Communications Commission's interpretations of it, forbid calls to cellular phones using an automatic dialer unless the recipient has given consent. There are two types of consent regarding calls to cellular phone lines: 1) prior express written consent and 2) prior express consent. 47 C.F.R. § 64.1200(a)(1), (2). The type of consent necessary depends on the nature of the call being placed. "[P]rior express written consent of the recipient is required for all telemarketing and advertisement calls." *Williams v. Nat'l Healthcare Review*, No. 2:15-CV-0054-RFB-PAL, 2017 WL 4819097, at *4 (D. Nev. Oct. 25, 2017). But only "[p]rior express consent of the called party is required for non-telemarketing informational calls." *Id.* Plaintiff believes *all* the calls made during the ███ campaigns were "telemarketing" such that Defendant needed "prior

express written consent" before placing those calls. Defendant disagrees, arguing each call during the ███ campaigns was unique and determining whether a call constituted "telemarketing" will require an individualized assessment of the call's contents. For purposes of class certification, the dispute boils down to whether determining the nature of the calls to putative class members should be deemed a common question that can be proven for all class members at once or if the purpose of each call is an individual question that will vary based on the contents of each call.

The applicable TCPA regulation defines "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). Defendant reads this definition as requiring a review of "the content of calls in order to determine their purpose." (Doc. 123 at 16). In other words, Defendant asserts a call can be deemed "telemarketing" only after reviewing the contents of the call and determining if the caller encouraged "the purchase or rental of, or investment in, property, goods, or services" during the call. 47 C.F.R. § 64.1200(f)(12). That is incorrect.

According to the FCC, "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call." *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act Rules*, 28 F.C.C. Rcd. 6574, 6583 (2013). Thus, a prohibited "telemarketing" call occurs as soon as an entity "initiates" the call. In other words, assuming there was no express written consent, a TCPA violation occurs once the "steps necessary to physically place [the telemarketing] telephone call" are completed. The existence of a TCPA violation does not depend on an analysis of the contents of the call. In fact, it does not even require the call be answered.[7]

---

[7] In an unpublished opinion, the Ninth Circuit has indicated an individual has standing to pursue TCPA claims even when the calls are not answered, establishing that violations occur even if a call is not answered. *Romero v. Dep't Stores Nat'l Bank*, 725 F. App'x 537, 539 (9th Cir. 2018). And multiple courts have explicitly recognized a plaintiff may assert

Because the TCPA can be violated merely upon the initiation of a call for a prohibited purpose, Defendant's argument that the Court would necessarily have to analyze the contents of each call to determine whether a TCPA violation occurred is incorrect. The relevant question is Defendant's *purpose* in initiating the calls, not what *occurred* on each call. Of course, it is often easiest to determine the purpose of a call by looking at a call's contents. But contents are not the only way.

The fact that a violation may occur regardless of a call's contents is illustrated by a decision from the Eighth Circuit. There, the plaintiffs "received two unsolicited, prerecorded messages on their home phone line."[8] *Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 816 (8th Cir. 2015). Those calls were part of a promotional campaign for a movie. The messages, stated in full, "Liberty. This is a public survey call. We may call back later." *Id.* The plaintiffs sued for violations of the TCPA but the district court concluded the plaintiffs had not "suffered an injury in fact because none of the messages they had received contained an advertisement, telemarketing message, or telephone solicitation, in violation of the [TCPA]." *Id.* at 819. The Eighth Circuit disagreed.

In the Eighth Circuit's view, the TCPA's regulations meant the "content of the calls controlled whether they were 'advertisements'" but the calls' "purpose controlled whether they were 'telemarketing.'" *Id.* at 820. While the defendant argued a court "should consider only the content of the calls in determining whether they were 'telemarketing,'" the Eighth Circuit determined the regulations did not require such an approach. Instead,

a TCPA violation for unanswered calls. *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015), *reversed on other grounds*, 894 F.3d 473 (2d Cir. 2018) ("[Defendant] violated the statute each time it placed a call using its [automatic dialer] without consent, regardless of whether the call was answered by a person, a machine, or not at all."); *Fillichio v. M.R.S. Assocs., Inc.*, No. 09-61629-CIV, 2010 WL 4261442, at *3 (S.D. Fla. Oct. 19, 2010) ("[T]he prohibition in the TCPA applies to phone calls placed to cellular telephone numbers even if the intended recipient does not answer the calls. It is the mere act of placing the call that triggers the statute.").

[8] Because the call was not to a cellular telephone line, the particular TCPA provision at issue was different than what is at issue in the current case. However, the meaning of "telemarketing" is the same regardless of which provision is at issue.

the regulations defined "telemarketing" such that it "occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services." *Id.* at 820. And because the "context of the calls" indicated they were for the purpose of promoting a movie, "they qualified as 'telemarketing' even though the messages never referenced the film." *Id.* Thus, the TCPA had been violated based solely on the purpose for which the calls were placed.

Returning to the present case, Defendant's repeated insistence that the Court must look to the content of each call to determine whether each call was "telemarketing" is simply incorrect. As set out by the Eighth Circuit, it is the purpose behind a call that controls, not what happened during the call. And as noted by the Ninth Circuit in approaching a similar issue under the TCPA, courts should "approach the problem" of determining why calls were made "with a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

Based on the controlling legal framework, Defendant's purpose in making calls under the ███ campaigns presents a common question that is susceptible to being resolved using common evidence. ████████████████████████████████████ ██████████████ Plaintiff may be able to prove there was a common purpose in making each of the calls. Indeed, based on the present evidence, there is a significant likelihood Plaintiff will be able to show the purpose behind the calls in each campaign was to "encourage[e] the purchase" of Defendant's products or services. 47 C.F.R. § 64.1200(f)(12). If Plaintiff can make such a showing, the contents of each call will be irrelevant.

Defendant disagrees with this conclusion and argues "individualized issues will *always* dominate the call purpose inquiry." (Doc. 123 at 14). Defendant cites a number of cases in support of this contention but those cases arose under very different facts and, in any event, appear to misread the TCPA.

Defendant primarily relies on *Newhart v. Quicken Loans Inc.*, as establishing class certification is never appropriate when the content of calls varied. No. 9:15-CV-81250,

2016 WL 7118998 (S.D. Fla. Oct. 12, 2016). In that case, the defendant was a mortgage lender that had called approximately 2,000 borrowers regarding the borrowers' possible participation in the Home Affordable Refinance Program ("HARP"). The plaintiff received nine calls on his cellular telephone and he sued the mortgage lender under the TCPA, alleging the calls constituted prohibited "telemarketing." The plaintiff sought class certification, arguing the calls to all putative class members qualified as "telemarketing" because they were made under an "overall campaign" meant "to encourage borrowers to obtain a HARP refinance loan." *Id.* at *3.

In denying the motion for class certification, the district court noted the calls at issue had been placed for a variety of reasons:

> [T]he purpose of the challenged calls varied from one to the next. Some calls were made in direct response to written and oral requests from borrowers. Such invited calls are not unsolicited telemarking calls 'initiated' for the purpose of marketing a good or service. Other calls were transactional communications to facilitate, complete, or confirm HARP relief that the . . . borrower already had elected to pursue. [Those] calls do not constitute telemarketing because their purpose is not to 'encourage the purchase of any [good or] service.

*Id.* at *4. The court believed "the challenged calls [were] not uniform in purpose" which meant "the telemarketing issue [could not] be resolved by common, classwide evidence." *Id.* At first glance, this decision would appear to help Defendant. But upon a closer examination, it does not.

To begin, the *Newhart* court appears to have operated from an incorrect understanding of the TCPA. As already discussed, the "purpose" for which a call is made does not necessarily turn on the contents of the call. For example, an entity that initiates a call to a cellular telephone with the undisputed purpose of trying to sell a product, has violated the TCPA even if the call is not answered. Similarly, if an entity initiates a call with the undisputed purpose of selling a product, the call is picked up, but the recipient prevents the call from involving discussions regarding the purchase of the product (such as by hanging up immediately), the entity still has violated the TCPA. Accordingly, the

*Newhart* court's belief that the "purpose" of calls must be evaluated based on the content of each call is incorrect.[9]

That being said, the *Newhart* court's decision is understandable because there the defendant offered evidence that many of the calls under the broad "overall campaign" identified by the plaintiff were not "telemarketing" calls. Some of the calls placed under the campaign at issue were calls based on "written and oral requests from borrowers." Those type of calls categorically did not qualify as "telemarketing." Other calls meant merely to confirm the recipient wished to participate in HARP also did not qualify as "telemarketing." Based on evidence establishing varying purposes, the *Newhart* court's conclusion that the purpose of the "overall campaign" could not be determined using common evidence was reasonable. In the present case, however, Defendant has not offered any *specific* evidence of calls under the ▮▮▮ campaigns that were not initiated for the purpose of telemarketing. Instead, all the available evidence is that the calls were handled by CDT members ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Unlike the *Newhart* court, there is significant evidence here that the calls initiated under the ▮▮▮ campaigns were initiated for telemarketing purposes. At present, the question of the calls' purpose presents a question that can be resolved by common evidence. And that question is more important than almost any other issue.

### ii. What Lines Qualify for Protection Under the TCPA?

In arguing that common questions do not predominate, Defendant also argues the proposed class raises individual questions regarding the TCPA's application to particular telephone lines. According to Defendant, the TCPA does not apply to "business telephone

---

[9] The other cases cited by Defendant seem to suffer from a similar flaw. Those cases involve discussions premised on the erroneous belief that the TCPA can only be violated based upon the calls' contents. Thus, neither the decision in *Jacobs v. Quicken Loans, Inc.*, 2017 WL 4838567 (S.D. Fla. Oct. 19, 2017) nor *Fitzhenry v. ADT Corp.*, 2014 WL 6663379 (S.D. Fla. Nov. 3, 2014), is helpful for assessing the request for class certification in the present case.

lines" and the Court would have to conduct individualized inquiries to determine whether each phone number Defendant called was a "business line." This argument is based on another misunderstanding of the TCPA.

To understand why Defendant's argument is baseless, one need only read the relevant portions of the TCPA. The TCPA can be thought of as containing two distinct prohibitions. Both prohibitions are found in 47 U.S.C. § 227(b)(1), which provides, in relevant part:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States--
>
> (A) to make any call . . . using any automatic telephone dialing system . . .
>
> (iii) to any telephone number assigned to a . . . cellular telephone service.
>
> (B) To initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.

The first prohibition, which can be referred to as the "(b)(1)(A) prohibition," makes it unlawful to "make any call" to a cellular telephone using an automatic telephone dialing system. The second prohibition, which can be referred to as the "(b)(1)(B) prohibition," makes it unlawful to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice." Thus, the (b)(1)(A) and (b)(1)(B) prohibitions are very different. Whether a telephone line was a "residential line" is relevant for purposes of the (b)(1)(B) prohibition but irrelevant for purposes of the (b)(1)(A) prohibition. There simply is no basis in the statutory text to conclude the (b)(1)(A) prohibition turns on whether the cellular line belonged to an individual or a business.

Defendant ignores the actual text of the TCPA and claims, as a general matter, the TCPA does not apply to a "business telephone line." (Doc. 123 at 23). In support, Defendant cites cases addressing the application of the (b)(1)(B) prohibition to business

lines.[10]  Those cases are irrelevant because they address the wrong statutory provision. Courts addressing the correct provision have noted use of a cellular telephone line for business purposes has no impact on the applicability of the TCPA.  *See, e.g.*, *Johansen v. GVN Michigan, Inc.*, No. 1:15-CV-00912, 2015 WL 3823036, at *1 (N.D. Ill. June 18, 2015).

Beyond citing inapplicable cases, Defendant also argues the FCC has "declined to extend the TCPA" to cover "all cellular telephone lines." (Doc. 123 at 24).  This argument is convoluted and incorrect.  In support of its assertion that the TCPA does not cover all cellular telephone lines, Defendant cites a regulatory ruling where the FCC created the National Do-Not-Call Registry.  By statute, the FCC was authorized to create a "single national database" containing "a list of telephone numbers of *residential subscribers* who object to receiving telephone solicitations."  47 U.S.C. § 227(c)(3) (emphasis added).  In 2003, the FCC determined the statutory reference to "residential subscribers" should be construed to include cellular telephone lines.  In allowing cellular telephone lines to participate in the Do-Not-Call Registry the FCC noted some cellular telephone lines might not qualify as "residential subscribers":

> As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers."

*Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 68 FR 44144-01.  Defendant reads that brief statement as proof that the FCC has concluded not all cellular telephone lines are subject to the protections of the TCPA as a

---

[10] *Owens v. Starion Energy, Inc.*, No. 3:16-CV-01912 (VAB), 2017 WL 2838075, at *3 (D. Conn. June 30, 2017) (addressing whether TCPA applied to call to landline used for business purposes); *Bank v. Indep. Energy Grp. LLC*, No. 12-CV-1369, 2014 WL 4954618, at *1 (E.D.N.Y. Oct. 2, 2014) (same); *Baker v. Certified Payment Processing*, L.P., No. 16-CV-03002, 2016 WL 3360464, at *3 (C.D. Ill. June 1, 2016) (same); *Clauss v. Legend Sec., Inc.*, No. 4:13-CV-00381-JAJ, 2014 WL 10007080, at *3 (S.D. Iowa Sept. 8, 2014) (same).

- 22 -

general matter.  But Defendant's conclusion is an oversimplification.

The FCC's statement that only some cellular lines are entitled to placement on the Do-Not-Call Registry has nothing to do with the TCPA's general prohibition on telemarketing calls to cellular lines.  The Court is unable to understand why Defendant believes a statement by the FCC regarding application of the Do-Not-Call Registry to cellular telephone lines should be read as amending sections of the TCPA to provide cellular phone lines used for business are not protected as a general matter.  There is nothing in the statutory text, or FCC guidance, that supports Defendant's argument.

If Defendant's calls under the ███ calling campaigns were for telemarketing purposes, the fact that the cellular lines Defendant called might also have been used for business purposes is irrelevant.  Defendant's claim that the nature of the cellular lines presents "individual questions" is wrong.  In fact, there is neither a common nor individual question that must be answered.  Telemarketing calls to cellular telephone lines are prohibited in the absence of express written consent, even if the cellular telephone lines were used for business.

### iii.    Common Questions Predominate

Viewed together, there are two substantial "common questions."  First, whether the system Defendant used to place the calls qualifies as an "automatic telephone dialing system."  And second, whether the purpose behind the calls was "telemarketing."  Both of these questions can be resolved using common evidence and the resolution of these questions easily predominates over any individualized inquiries, such as the number of calls received.[11]  The first requirement under Rule 23(b)(3) is met.

---

[11] Defendant presents another argument immediately following its "predominance" section that must be addressed.  Defendant argues "class membership cannot be determined from collective evidence."  (Doc. 123 at 25).  Defendant argues its own records are often inaccurate and it would be inordinately difficult to determine who received the allegedly prohibited telemarketing calls.  It is not entirely clear what requirement of Rule 23 this argument is aimed at as there is no requirement in Rule 23 that class membership be easily ascertainable.  To the extent the Court can understand this argument, Defendant seems to believe Plaintiff must offer a simple way of identifying each and every class member before a class can be certified.  Defendant is wrong.

## B. Superiority

In addition to requiring that common questions predominate over individual questions, "Rule 23(b)(3) also requires that class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998). *Id.* Sometimes labeled the "superiority inquiry," this "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Id.*

Rule 23 itself "provides a non-exhaustive list of factors" a court should consider when conducting its superiority inquiry. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 713 (9th Cir. 2010). Those factors include "the class members' interests in individually controlling the prosecution . . . of separate actions," any other pending litigation, whether concentrating the claims in a particular forum would be advantageous, and "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). These factors should be considered, along with "other, non-listed factors" in conducting a "broad inquiry" into determining whether a class action is preferable to other possibilities. *Bateman*, 623 F.3d at 713.

Dealing first with the listed factors, the present record establishes class members lack a substantial interest in individually controlling the prosecution of their claims. The

---

In *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017), the defendant argued that in addition to the requirements listed in Rule 23, a plaintiff "must also demonstrate that there is an administratively feasible way to determine who is in the class." The Ninth Circuit rejected that position and held "the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification." *Id.* at 1133. In the Ninth Circuit's view, if there will be problems identifying class members, notifying class members, or assessing the veracity of individuals claiming to be class members, all those issues should be addressed after certification.

Applying the logic of *Briseno* to the present case makes short work of Defendant's argument regarding difficulties identifying class members. While Defendant believes it will be difficult to identify the class members, that possible difficulty is not a valid basis on which to deny class certification. Difficulties in identifying or notifying class members can be addressed later once it is known whether such difficulties even exist.

amount of damages available to a single individual is low and for many people a possible award of even the maximum amount of statutory damages would not be enough of an incentive to pursue litigation. In addition, the parties have not identified any other pending litigation involving similar claims and concentrating the claims in Arizona is appropriate given that Arizona is where, in Defendant's words, "[t]he events giving rise to this action occurred." (Doc. 18 at 14). Finally, this case will not present any special difficulty in case management should it proceed as a class action. Thus, the basic considerations under the superiority inquiry support certification. Defendant presents a number of "superiority" arguments that do not fall cleanly under the usual considerations but none of them have merit.

Defendant first argues a class action is not superior because Plaintiff's proposed class definition is fatally underinclusive. Defendant contends that if every call made by CDT members qualified as "telemarketing," there is no reason to limit the class to the ███ ███████ campaigns identified in Plaintiff's proposed class definition. Defendant fears it will "potentially face dozens of class action lawsuits seeking to impose liability" for the same time period but involving different campaigns. (Doc. 123 at 30). Defendant does not cite any authority requiring certification of the broadest possible class. The fact that other interested parties might sue Defendant for similar misconduct during the same time period is not a basis for concluding *this* case should not proceed as a class action.

Defendant next argues the TCPA was meant only to provide "a cost-efficient remedy for individual plaintiffs." (Doc. 123 at 31). Thus, Defendant believes the Court should enforce the alleged original intent of the TCPA by requiring the ██████ putative class members file independent suits in "small claims courts across the country." (Doc. 123 at 32). This argument is very close to frivolous. There is nothing in the text of the TCPA indicating class actions are not appropriate. When Congress wishes to preclude class actions, it knows how to do so. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 87 (2006) (noting Securities Litigation Uniform Standards Act of 1998 "denies plaintiffs the right to use the class-action device to vindicate certain claims"). And

the usual rule is that class actions are available absent clear indications Congress meant to preclude them. *See Califano v. Yamasaki*, 442 U.S. 682, 700 (1979). Countless courts have certified classes under the TCPA and if there is, in fact, a per se bar to class certification under the TCPA, it appears no court has discovered it yet. Defendants offer no convincing reason for this Court to be the first.

Defendant's final superiority argument is that requiring individual actions would be better because using the class action device in the present circumstances would be "unconstitutional." In Defendant's view, "the aggregation of statutory damages would result in an excessive and disproportionate damages award." (Doc. 123 at 32). The problem for Defendant is the Ninth Circuit has rejected this exact argument.

In *Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708, 711 (9th Cir. 2010), the plaintiff filed a putative class action based on the defendant allegedly violating a federal statute prohibiting receipts from containing more than the last five digits of a credit card number. The federal statute allowed for the recovery of statutory damages of $100 to $1000 per violation. *Id.* The plaintiff sought certification of a class covering 290,000 violations, meaning there was close to $300 million in damages at issue. *Id.* The district court refused to certify a class "because, in its opinion, class treatment could result in enormous liability completely out of proportion to any harm suffered by the plaintiff." *Id.* The Ninth Circuit concluded the extent of a defendant's liability was not a proper factor at the certification stage.

As relevant here, the Ninth Circuit recognized class actions seeking large amounts present unique challenges for defendants. In particular, "class certification may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability." *Id.* at 721. But "the fairness of the pressure i.e., the sociological merits of the small claims class action[,] is not a question for [a court] to decide." *Id.* at 722. The appropriate time a court might intercede on the subject of damages is not at the certification stage but after an award is made. If a plaintiff "prevail[s] at trial, the district court may be entitled to reduce the award if it is unconstitutionally excessive."

*Id.* at 723.  It is not, however, "appropriate to evaluate the excessiveness of [an] award at" the class certification stage.  *Id.*

Defendant cites *Bateman* but apparently does not realize it forecloses its arguments regarding the potentially large damages at issue.  Using the maximum possible statutory damage award for each class member, Defendant could be liable for ███████████ in damages.  That amount of damages might be cause for concern and, if Defendant is found liable, the appropriate amount of damages will have to be examined.  But, as stated in *Bateman*, it is premature to do so now.  Class certification will not be denied merely because, should Defendant eventually lose, its liability exposure will be substantial.

Overall, the "superiority" inquiry comes down to whether it is better to have a single class action seeking relief on behalf of ████████ individuals or some other, unidentified alternative.  Realistically, the only alternative is for Defendant to avoid effectively all liability for its actions.  *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (noting the "*realistic* alternative to a class action is not 17 million individual suits, but zero individual suits").   A class action is far superior to the alternative of most of the allegedly harmed individuals obtaining no relief.

## III.    Conclusion on Rule 23(b)(3) Certification

Plaintiff has met the four requirements of Rule 23(a) as well as the requirements of Rule 23(b)(3).[12]  These determinations are preliminary and do not establish Plaintiff will prevail on the merits.  *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 479 n.9 (2013) (noting class "certifications are not frozen once made" and classes can be decertified "based on circumstances developing as the case unfolds").   Additional

---

[12] Plaintiff also seeks certification under Federal Rule of Civil Procedure 23(b)(2).  Because that request appears to be made only in the alternative in the event certification under Rule 23(b)(3) were to be denied, that request will be denied as moot.  Defendant also moves to exclude a report from Plaintiff's expert.  Because evidence need not be admissible at the class certification stage, Defendant's arguments regarding the admissibility of the expert's report are misplaced.  In any event, the Court did not rely on the expert's report in conducting its analysis.  Therefore, Defendant's request to exclude the expert will be denied as moot.

evidence might surface establishing certification was inappropriate. But "[n]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies Rule 23." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004-05 (9th Cir. 2018).

## IV. Appointment of Class Counsel

Rule 23(g) requires the Court appoint class counsel. To determine whether appointment of Plaintiff's current counsel would be appropriate, the Court must consider "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court also "must" determine that counsel will "fairly and adequately represent the interests of the class." Fed. R. Civ. 23(g)(4). Finally, the Court "may" consider "another other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Plaintiff's counsel has completed a large amount of discovery, presented significant evidence in support of the class's claims, and has expended substantial resources in pursuing this litigation. Counsel appears willing to expend the additional resources necessary to continue this litigation. Counsel's briefing establishes he has extensive knowledge regarding the TCPA and its application. And counsel represents he "has experience litigating TCPA class actions and has been appointed class counsel in previous actions." (Doc. 122 at 20). Defendant offers no reason to believe counsel would be inadequate. Plaintiff's counsel will be appointed as class counsel.

## V. Sealed Filings

This Order cites extensively to filings that are currently under seal. This Order will be filed under seal but the parties will be required to submit a joint statement identifying which portions, if any, of the Order should remain under seal. If the parties agree on the portions to be redacted, the joint statement should be accompanied by a copy of this Order

with the appropriate redactions. If the parties do not agree, they should submit a motion to seal, accompanied by a copy of the order containing the redactions each side believes necessary as well as a statement identifying the redactions where they do not agree. In making any redactions, the parties must account for the fact that the standard for sealing Court orders of this type is very high. *See Opperman v. Path, Inc.*, No. 13-CV-00453-JST, 2017 WL 1036652, at *4 (N.D. Cal. Mar. 17, 2017) (applying "compelling reasons" standard to class certification papers); *Lucas v. Breg, Inc.*, No. 15-CV-00258-BAS-NLS, 2016 WL 5464549, at *1 (S.D. Cal. Sept. 28, 2016) (same).

### VI.    Status Report

The parties will be directed to submit a joint statement outlining their proposals for the remainder of this case. The joint statement must include proposed dates for the submission by Plaintiff regarding notice to the class, the completion of any additional discovery if necessary, and the filing of dispositive motions. The parties should keep in mind the Court does not allow for the filing of dispositive motions before a post-discovery status hearing is held and a party planning on filing a dispositive motion is able to articulate a sufficient basis for filing such a motion.

Accordingly,

**IT IS ORDERED** the Motion for Class Certification (Doc. 111) is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 23(b)(3) the following class is certified:

> All persons within the United States to whom, from November 4, 2014 through October 19, 2016, Defendant initiated a call to his or her cellular telephone using an dialing system pursuant to De call campaign and/or its campaign.

**IT IS FURTHER ORDERED** John R. Cox is appointed as class counsel.

**IT IS FURTHER ORDERED** no later than **March 29, 2019**, the parties shall submit a joint statement as outlined above regarding the unsealing of this Order.

**IT IS FURTHER ORDERED** no later than **March 29, 2019**, the parties shall file a second joint statement outlining the remainder of this case, including dates for notice to

class members, the completion of all discovery, and dispositive motions.

Dated this 15th day of March, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge

Cc: All Counsel of Record

# EXHIBIT B

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Bennett, | No. CV-16-03908-PHX-ROS |
| Plaintiff, | **SEALED ORDER** |
| v. | |
| GoDaddy.com LLC, | |
| Defendant. | |

Plaintiff Jason Bennett received calls on his cellular phone from Defendant GoDaddy.com, LLC. Plaintiff believes those phone calls were "telemarketing calls" prohibited by the Telephone Consumer Protection Act ("TCPA"). Plaintiff now seeks to certify a class of approximately ▮▮▮▮▮ individuals who received similar calls on their cellular phones. GoDaddy opposes class certification, primarily arguing each call was unique and the Court would have to conduct "individualized inquiries" to determine which of the calls qualified as "telemarketing." Class certification is not the proper time to delve too deeply into the merits of Plaintiff's claim. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). And the inquiry into the purpose of particular calls must be done with "a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Class certification is appropriate.

## BACKGROUND

Defendant is "the world's largest technology provider dedicated to small businesses

with over 17.5 million customers worldwide." (Doc. 123-1 at 3). Defendant provides web-based products and services, such as domain name registration and website hosting. Plaintiff is a small business owner who, sometime prior to September 2015, purchased services from Defendant. (Doc. 122-1 at 46). In doing so, Plaintiff provided a contact number. Plaintiff later updated his contact number to his cellular number. Plaintiff did not provide express written consent that Defendant could make telemarketing calls to his contact number. Despite the absence of consent, Defendant placed two calls to Plaintiff's cellular telephone line.[1] The parties disagree on why those calls were made. To understand why the legality of those two calls presents common issues, the Court must explore Defendant's operations in some detail.

## I. Defendant's Operations

Defendant describes its "customer service efforts [as] spearheaded by two teams of call-center representatives that handle inbound and outbound calls." (Doc. 123-1 at 3). Defendant refers to its "outbound calling team" as the "Customer Development Team" or "CDT." (Doc. 123-1 at 2). Members of the CDT handle both inbound and outbound calls. Defendant believes it is inaccurate to view the CDT as primarily engaged in sales but Defendant's own documents establish the CDT was, in large part, focused on sales.[2]

According to a job posting for a position with the CDT, Defendant considered it an "inside sales team." The job posting described the position as "an outbound sales position, calling our existing customers to discuss their products and services." (Doc. 122-1 at 24).

---

[1] Defendant made more than two calls to Plaintiff's cellular phone but only two of those calls are relevant for purposes of class certification.

[2] Defendant points out that many of the documents regarding CDT training and performance post-date the time Plaintiff received the relevant calls. Defendant does not offer evidence, however, that the documents present an inaccurate depiction of how the CDT was structured and operating at the relevant time. Therefore, the evidence offered by Plaintiff provides substantial insight into what the CDT was and the purpose of its operations at the time Plaintiff received the calls. If that evidence is not from the relevant time period, the evidence may or may not be admissible at trial. The Court is free, however, to consider the evidence at this stage, even if it is ultimately deemed inadmissible. *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) (holding inadmissible evidence may be considered at class certification stage).

In describing who should apply, the job posting stated "applicants with a very strong sales background [would be] contacted first." In addition, applicants were expected to have the "[a]bility to close business sales." (Doc. 122-1 at 25).

Once an individual was hired for a position with the CDT, he attended a training session to learn about his job duties. The training materials sometimes paint CDT members as involved in more than merely selling products. But the training materials are primarily concerned with training new CDT members to be effective at closing sales. That intent becomes clear once one realizes Defendant refers to trying to get a customer to make a purchase as "consulting" with the customer. This is illustrated by a one-page article in the CDT training materials that discusses the concept of "consultative selling." That article states "consultative selling is all about the dialogue between the salesperson and the customer." (Doc. 122-1 at 19). The salesperson must identify the customer's needs "through a combination of preparation and effective probing and drilling-down into customer answers." (Doc. 122-1 at 19). Accordingly, in the context of CDT training and job performance, "consulting" and all of its variations, almost always means "selling."[3]

The CDT training materials begin with an overview of the "CDT Vision." That vision includes a promise for CDT members "to take a consultative approach to help our customers achieve their dreams using our products." (Doc. 122-1 at 3). The materials then elaborate that "consultative approach" means CDT members "ask leading questions about [customers'] goals, to help them with their business. [CDT members] do not blind pitch." (Doc. 122-1 at 3).

The training materials assume customers will usually view CDT members as "telemarketers" and the materials offer ways trainees can avoid that impression. (Doc. 122-1 at 5). The training materials ask the trainees to consider their own reactions when

---

[3] In opposing class certification, Defendant argues it does not "equate[] the term 'consult' with 'sale.'" (Doc. 123-1 at 5). Instead, Defendant argues CDT members are not expected to make a sale on every call but are expected "to frame their consultations within the context of each call." (Doc. 123-1 at 5). Defendant's semantic argument has little appeal given the way Defendant's own documents use the term "consulting." Defendant's training materials would make no sense if "consulting" was not a reference to selling.

they are called by "telemarketers" and the trainees are told they should prepare a "opening/intro" that will overcome any negative thoughts customers might have upon answering a call from a CDT member. (Doc. 122-1 at 5). The materials also instruct the trainees to consider the length of their calls. If their "calls don't last more than a minute, then you sound like a telemarketer. Slow down." (Doc. 122-1 at 5).

After discussing appropriate beginnings to phone calls, the materials discuss "the concept of 'stop words'" and trainees are told to avoid the "stop words" of "just, um, but, [or] actually." Trainees are also told they should not ask if customers have questions: "Don't ask if they have questions — If they had questions, they would have called you." (Doc. 122-1 at 6). Trainees are told to avoid using the phrase "Courtesy Calls." (Doc. 122-1 at 6). Building on the guidance mentioned earlier regarding "consultative selling," trainees are told to "[a]sk drill down questions." If the trainees do so, "when its time to make an offer, your customer already sees the value in your presentation of the solution." (Doc. 122-1 at 7). ███████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████ (Doc. 122-1 at 7). Trainees are instructed "about presenting offers and closing sales," including various "closing techniques" trainees should use. (Doc. 122-1 at 8). Regarding closings, trainees are told "Do not ask for the sale. Make it a statement." (Doc. 122-2 at 28).

Defendant uses a form to evaluate trainees' performance on outbound calls. (Doc. 122-2 at 32). That form specifies trainees are expected to "ask[] for the sale with confidence" and "overcome objections when necessary." (Doc. 122-2 at 32). Trainees must establish their ability to make sales before they can become CDT members. Trainees are expected to generate at least ███████████████████████████████████
███████████████ (Doc. 122-3 at 2). Those two metrics account for 45% of a trainee's evaluation score. The remaining 55% of the score consists of customer satisfaction,

"navigation assessment," and "trainer observation."[4]   Trainees must obtain a combined score of at least 80% to pass.  That means a trainee who generates very little in sales will not become a CDT member, regardless of his performance on the other metrics.

If a trainee passes and becomes a CDT member, his compensation depends on the amount of sales he makes.  While the documents establish the more sales a CDT member makes the more he earns, the documents do not provide the exact compensation scheme.  In general, each CDT member is assigned a "budget" reflecting the amount of ███████ ████████████████████████████ he is expected to generate.  If a CDT member meets his budget, receives a "fairly high customer service score based on customer surveys," and is available to take calls when he is expected to be, he is entitled to a bonus.  (Doc. 122-2 at 13-14).  If a CDT member is unable to achieve at least 70 percent of his budget, he is subject to "performance management activities."  That involves a supervisor working with the CDT member to "understand what challenges [he is] having that [are] preventing [him] from meeting the goals of [his] job."  (Doc. 122-2 at 15).  In other words, if a CDT member does not sell enough, he will be closely monitored until he starts selling at least 70 percent of his budget.

## II.   CDT Campaigns

Having trained the CDT members regarding sale techniques, Defendant then tasks its CDT members with contacting existing customers.  Those contacts are made through "outbound calling campaigns."   To conduct a campaign, Defendant's "Marketing Department develops a list of criteria to be used to trigger" which customers should be called.  For example, the Marketing Department might develop a campaign for the CDT members to call customers who had spent at least $150 on Defendant's services.  (Doc. 123-1 at 7).  After determining which customers should be called, the customers' numbers are loaded into an automated calling system and CDT members attempt to speak with the customers.  For purposes of class certification, there are two relevant outbound calling campaigns: the "US Domain Sales Leads" campaign and the "Ad Hoc Marketing 4"

---

[4] The parties have not defined these terms.

campaign.

Defendant used the following criteria to compile the customer list for the US Domain Sales Leads campaign: ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████ (Doc. 122-1 at 79). Neither party has explained how these criteria were applied in detail. Thus, it is unclear what aspect of each criteria, such as ████████████ was deemed relevant for purposes of this campaign. As for the "Ad Hoc Marketing 4" campaign, Defendant could not locate the criteria used "to generate the customer contacts lists for the Ad Hoc Marketing 4 campaign." (Doc. 122-1 at 75). But given Defendant's general practices, Defendant must have applied specific criteria to generate the list of customers that CDT members would attempt to speak with under that campaign.

During each of the campaigns, Defendant's automated dialing system placed calls to the selected numbers. Defendant is adamant that these campaigns were not telemarketing. In making this claim, Defendant has to make a series of rather dubious assertions. Defendant first states that the "naming conventions of call campaigns are not indicative of their purpose." (Doc. 123-1 at 8). According to Defendant, just because the two relevant campaigns were named "US Domain Sales Leads" and "Ad Hoc Marketing 4" does not mean the campaigns actually involved "sales" or "marketing." Defendant claims the names are effectively irrelevant because it "recycles campaign names for different purposes or uses a generic campaign name for shorter term campaigns." (Doc. 123-1 at 8). It is, of course, possible that Defendant decided to refer to the campaigns as "sales" and "marketing" campaigns even though the campaigns were not aimed at generating sales. But Defendant does not offer any explanation why it would use unnecessarily confusing names for the campaigns.

After disputing the relevance of the campaigns' names, Defendant next offers a claim that the calling campaigns were merely meant to limit the number of inbound calls.

Defendant does not explain why it preferred to make outbound calls instead of waiting for inbound calls. But regardless, Defendant argues Plaintiff was contacted during the two calling campaigns purely to ensure Plaintiff was happy with Defendant's services and not confused regarding those services. Defendant states it pursued the U.S. Domain Sales Lead campaign because Defendant was "receiving calls from customers who either do not understand how to use their new product or are confused about whether they actually need a particular product they purchased." (Doc. 123-1 at 8). Defendant allegedly designed the U.S. Domain Sales Lead campaign "to minimize the volume of these types of call to [Defendant's] inbound department" while also saving customers money. (Doc. 123-1 at 8). As for the Ad Hoc Marketing 4 Campaign, it was designed, among other purposes, to "advise customers [about] the need to transition" to a different service, contact customers regarding "standard account maintenance," and assist customers in "migrating" from a trial version of a service to the full version. (Doc. 123-1 at 8). The problem with these post-hoc explanations of the two campaigns is that the explanations are in significant tension with Defendant's training materials.

As pointed out earlier, Defendant's training materials told CDT members they should not ask the customers any questions because, if the customers "had questions, they would have called you." (Doc. 122-1 at 6). The training materials also told CDT members not to use the phrase "Courtesy Call." (Doc. 122-1 at 6). If the two campaigns were, in fact, courtesy calls to see if customers were confused, the instructions that CDT members not ask the customer any questions and not use the phrase "courtesy call" were very strange. Defendant does not explain how CDT members could possibly accomplish the purported objectives of the calling campaigns if CDT members were not supposed to ask the customers any questions. Overall, Defendant's view of the calling campaigns as involving pure customer service objectives is difficult to square with the underlying evidence.

### III. Calls to Plaintiff and Procedural History

Plaintiff received two calls on his cellular phone from CDT members. On January 27, 2016, Plaintiff received a call in connection with the Ad Hoc Marketing 4 campaign.

Defendant has provided a transcript of that call:

> **Plaintiff**: This is Jason.
>
> **CDT Member**: Hey, Jason. How's it going? This is Jordan at GoDaddy.
>
> **Plaintiff**: Good. Is this a sales call?
>
> **CDT Member**: Well, we're calling about some products you have so I mean, however you want to take it.
>
> **Plaintiff**: I'm not interested if it's a sales call. If domain names are expiring or something like that --
>
> **CDT Member**: Well, you may be interested in – just so you know the call may be recorded or retained for quality and training purposes. We're calling in reference to the restore fee you had to pay last year on your hosting plan. We wanted to let you know that we do offer site backups now on your hosting plan so that we can start backing up your content for you on our end. And if you ever have a situation where a hosting plan expired or a site got hacked or anything like that we could restore the copies of it.
>
> **Plaintiff**: I'm good. I appreciate the call.
>
> **CDT Member**: Not a problem. Like I said, we just want to make sure you know it's available to you so you don't have to pay $150 next time.
>
> **Plaintiff**: Alright. Thank you.
>
> **CDT Member**: Bye now.

(Doc. 117-1 at 18).

Plaintiff was also contacted on May 6, 2016, pursuant to the U.S. Domain Sales Lead campaign. The transcript of that call is as follows:

> **CDT Member**: Hello. This is George with GoDaddy looking for Jason.
>
> **Plaintiff**: Yep.
>
> **CDT Member**: Hello Jason. I'm business consulting here at GoDaddy and trying to do a review here on your account. I do have to mention this call may be recorded and retained for quality and training --
>
> **Plaintiff**: Is this a sales call?
>
> **CDT Member**: Well, it's actually – we go over the account just to make sure that you have everything you need and you're

not paying for something that's not needed.

**Plaintiff**: I'm good. Thank you.

**CDT Member**: And while I'm getting a billing too [end of recording].

(Doc. 117-1 at 17).

Shortly after receiving those two calls, Plaintiff filed this suit in the Southern District of Alabama. (Doc. 1). The original complaint proposed a very broad class definition that, in general, sought to cover "[a]ll persons within the United States" who, during the two years preceding the filing of the complaint, received an advertising or telemarketing call on a cellular telephone line from Defendant. (Doc. 1 at 5). Defendant filed its answer and, shortly thereafter, filed a motion to transfer venue to Arizona. (Doc. 9, 17). Plaintiff did not oppose the transfer and the case was transferred to Arizona in November 2016. (Doc. 22).

After arriving in Arizona, the Court adopted the parties' proposed discovery schedule. That schedule allowed Plaintiff a substantial period of time for discovery related to class certification and contemplated a "shorter time frame in which to complete any merits discovery, as necessary." (Doc. 35 at 7). During the class certification discovery period Plaintiff amended his complaint. (Doc. 75). The amended complaint proposed a slightly narrower class definition than what was proposed in the original complaint. After multiple extensions, the parties completed class certification discovery and Plaintiff filed his certification motion.

Plaintiff's motion for class certification proposes a narrower class definition than what he had proposed in his complaint and amended complaint. Plaintiff now seeks certification of a class defined as:

> All persons within the United States to whom, from November 4, 2014 through October 19, 2016, Defendant initiated a call to his or her cellular telephone using an automatic telephone dialing system pursuant to Defendant's "Ad Hoc Marketing 4" call campaign and/or its "US Domain Sales Lead" call campaign.

(Doc. 122 at 3). Plaintiff believes there are approximately ███ individuals covered by this definition. Defendant's opposition to the class certification motion raises a great number of arguments against certification. As explored below, while some of those arguments are plausible, some of the argument border on frivolous.

## ANALYSIS

As the party seeking class certification, Plaintiff "bear[s] the burden of demonstrating that [he has] met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Defendant's opposition to the request for class certification spends the vast majority of its time arguing Plaintiff cannot satisfy the requirements of Rule 23(b)(3). As for the four requirements of Rule 23(a), Defendant makes only half-hearted efforts to dispute some of them. Following Defendant's lead, the Court will address the Rule 23(a) in relatively brief fashion before turning to the core of Defendant's opposition.

### I.     Rule 23(a) Requirements

The four requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of representation. *Id.* The Court must conduct a "rigorous analysis" of each of these requirements. *Id.* "Frequently that 'rigorous analysis' will entail some overlap with the merits of the underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Notwithstanding that overlap, class certification is not the appropriate time to definitively resolve the merits. "Merit questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

#### A.  Numerosity

To meet the numerosity requirement, Plaintiff must establish the proposed class is so large that joinder of all members would be impracticable. This "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of*

the *Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980).  The present class easily satisfies this requirement as the proposed class includes approximately ████ individuals.  The numerosity requirement is met.

**B.  Commonality**

The commonality requirement specifies Plaintiff must show "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This "language is easy to misread, since any competently crafted class complaint literally raises common 'questions.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).  "What matters," therefore, "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.*  That is, there must be at least one "common contention" that "is central to the validity" of the claims and that can be resolved "in one stroke."  *Id.*

In this case, there are at least two common questions which can be resolved in one stroke and that will drive the resolution of the litigation.  The first common question is based on the fact that TCPA liability attaches only if Defendant used "an automatic telephone dialing system" as defined by statute and regulation.  47 U.S.C. § 227(a)(1).  Defendant used the same dialing system to call Plaintiff and all putative class members.  Accordingly, determining whether Defendant's dialing system was "an automatic telephone dialing system" is a question crucial to the validity of the putative class's claims that can be resolved in one stroke, based on the same evidence for everyone.  Accordingly, the minimum requirement that there be at least one "common question" is easily met.

The second common question involves the purpose for which calls to Plaintiff and the class members were made.  The TCPA prohibits initiating calls to cellular telephone lines, without express written consent, "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. § 64.1200(f)(12).  As explored in more detail below, the purpose for Defendant's calls to all class members is susceptible to being resolved in a single stroke, based on the same evidence.

Because there are two common questions that can generate answers that will drive the resolution of the litigation, the commonality requirement is met.

### C. Typicality

"The test of typicality is whether other members have the same or similar injury [as the Plaintiff], whether the action is based on conduct which is not unique to [Plaintiff], and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). This does not require Plaintiff and the class members be "substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). It is enough if Plaintiff's claims are "reasonably coextensive with those of absent class members." *Id.* Typicality also requires the Court ensure Plaintiff is not "subject to unique defenses which threaten to become the focus of the litigation." *Id.*

Plaintiff and all putative class members suffered the same injury based on the same conduct by Defendant in the form of unauthorized calls to their cellular telephone lines. *Van Patten v. Vertical Fitness Grp.*, LLC, 847 F.3d 1037, 1043 (9th Cir. 2017) (concluding a plaintiff had standing to pursue TCPA claims because "[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients"). There are no relevant differences between Plaintiff's claims and the putative class members' claims. *Cf. Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) ("Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose . . . ."). Therefore, Plaintiff has satisfied the typicality requirement.

Defendant presents two arguments against typicality, neither of which is convincing. Defendant first argues Plaintiff is not typical because he was "well-versed in the TCPA prohibitions and requirements in the years leading up to this lawsuit." (Doc. 123 at 34). According to Defendant, Plaintiff knows more about the TCPA than the putative class members and that means he cannot satisfy the typicality requirement. Defendant cites no authority holding that an individual is not "typical" merely because he is more knowledgeable than the typical class member.[5] Plaintiff's knowledge regarding

---

[5] Defendant cites *Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 382 (C.D. Cal.

- 12 -

the TCPA does not render him atypical.

Defendant's second argument against typicality is that Plaintiff is subject to a unique defense. According to Defendant, the TCPA does not prohibit telemarketing calls to "business lines" and Plaintiff received calls on a line Plaintiff holds out to the public as the telephone number of his business. Thus, Defendant believes Plaintiff will be subject to the unique "business line" defense. As explored below, however, the TCPA forbids all calls to cellular telephone lines, regardless whether those lines are also used for business purposes. Therefore, Plaintiff is not subject to a unique defense. Plaintiff has satisfied the typicality requirement.

### D. Adequacy of Representation

The final Rule 23(a) requirement is that Plaintiff and his counsel be willing and able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires answering two questions: "(1) Do [Plaintiff and his counsel] have any conflicts of interest with other class members, and (2) will [Plaintiff and his counsel] prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Plaintiff and his counsel have pursued discovery and vigorously litigated Plaintiff's claims up to this point. There is no evidence that Plaintiff and his counsel have a conflict of interest with other class members. Rather, all indications are that Plaintiff and his counsel will fairly and adequately protect absent class members.

Defendant's only argument against adequacy is that Plaintiff and his counsel have decided not to try to obtain certification of the broadest possible class. Defendant believes the decision to narrow the class definition to two campaigns, instead of all calls handled by CDT members, means Plaintiff has "an inherent conflict between himself and the members of the proposed class, some of whom may have received calls in one of the [other]

---

2016), in support of their position that a knowledgeable plaintiff may not qualify as typical. The analysis in that case, however, turned on the plaintiff being subject to unique defenses. Thus, the *Nghiem* court determined class certification was not appropriate because "[t]he major focus of this litigation will be on [the] issues and defenses unique to [the plaintiff], not on the claims of the class." *Id.* at 382-83.

campaigns" conducted by CDT members. (Doc. 123 at 36). Defendant has not cited any authority that a representative plaintiff must pursue the broadest possible class definition.[6] Plaintiff's decision to pursue a narrow class of individuals allegedly harmed by Defendant does not render him or his counsel inadequate to represent the class.

## II. Rule 23(b)(3) Certification

Having met the four requirements of Rule 23(a), Plaintiff must also meet the requirements of one of the subdivisions founds in Rule 23(b). Plaintiff seeks certification primarily under Rule 23(b)(3). That subsection requires Plaintiff show his proposed class satisfies two conditions: 1) "common questions must predominate over any questions affecting only individual members," and 2) "class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).

### A. Predominance

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016). This requires the Court "give careful scrutiny to the relation between common and individual questions in a case." *Id.* This scrutiny involves identifying the "common questions" as well as the "individual questions" and determining which of the two will be more important to resolving the case. Common questions are those "where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* Individual questions are those where class members "will need to present evidence that varies from member to member." *Id.* A

---

[6] Defendant cites a decision by the Ninth Circuit where the plaintiff and his counsel did not satisfy the adequacy requirement. *Drimmer v. WD-40 Co.*, 343 F. App'x 219, 221 (9th Cir. 2009). That decision was based on strange facts where the plaintiff and his attorney were "close friends" and the attorney was also the plaintiff's landlord. The Ninth Circuit concluded that relationship raised concerns the plaintiff's decisions would "not be based on the best interests of class members, but on the best interests of his attorney." *Id.* There is no evidence that Plaintiff and his counsel have anything similar to that type of relationship.

- 14 -

class can be certified only when the common questions "are more prevalent or important" than the individual questions. *Id.* A class can be certified even if some crucial issues will require individualized proof. For example, the prospect of individualized damages inquiries is not necessarily enough to defeat certification. *Id.*

Defendant's opposition begins by conceding that one of the major questions in the case should be deemed a common question. Defendant states "whether the Cisco dialer used to place the challenged calls constitutes an 'automatic telephone dialing system' under the TCPA can be resolved by common evidence." (Doc. 123 at 13 n.1). Accordingly, there is at least one common question to be factored into the predominance inquiry.

After conceding the nature of the dialer presents a common question, Defendant argues the remaining important issues should be deemed individual questions. Defendant believes two of the most important questions will be whether each call to a class member constituted "telemarketing" and whether each call was placed to a telephone line that "qualifies for protection under the TCPA." (Doc. 123 at 12). Defendant believes both of these questions will require evidence that varies from individual to individual. Defendant's presentation of these questions, however, is based on misunderstanding the relevant provisions of the TCPA.

### i. What Calls Constitute Telemarketing?

The TCPA and the Federal Communications Commission's interpretations of it, forbid calls to cellular phones using an automatic dialer unless the recipient has given consent. There are two types of consent regarding calls to cellular phone lines: 1) prior express written consent and 2) prior express consent. 47 C.F.R. § 64.1200(a)(1), (2). The type of consent necessary depends on the nature of the call being placed. "[P]rior express written consent of the recipient is required for all telemarketing and advertisement calls." *Williams v. Nat'l Healthcare Review*, No. 2:15-CV-0054-RFB-PAL, 2017 WL 4819097, at *4 (D. Nev. Oct. 25, 2017). But only "[p]rior express consent of the called party is required for non-telemarketing informational calls." *Id.* Plaintiff believes *all* the calls made during the two campaigns were "telemarketing" such that Defendant needed "prior

express written consent" before placing those calls. Defendant disagrees, arguing each call during the two campaigns was unique and determining whether a call constituted "telemarketing" will require an individualized assessment of the call's contents. For purposes of class certification, the dispute boils down to whether determining the nature of the calls to putative class members should be deemed a common question that can be proven for all class members at once or if the purpose of each call is an individual question that will vary based on the contents of each call.

The applicable TCPA regulation defines "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). Defendant reads this definition as requiring a review of "the content of calls in order to determine their purpose." (Doc. 123 at 16). In other words, Defendant asserts a call can be deemed "telemarketing" only after reviewing the contents of the call and determining if the caller encouraged "the purchase or rental of, or investment in, property, goods, or services" during the call. 47 C.F.R. § 64.1200(f)(12). That is incorrect.

According to the FCC, "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call." *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act Rules*, 28 F.C.C. Rcd. 6574, 6583 (2013). Thus, a prohibited "telemarketing" call occurs as soon as an entity "initiates" the call. In other words, assuming there was no express written consent, a TCPA violation occurs once the "steps necessary to physically place [the telemarketing] telephone call" are completed. The existence of a TCPA violation does not depend on an analysis of the contents of the call. In fact, it does not even require the call be answered.[7]

---

[7] In an unpublished opinion, the Ninth Circuit has indicated an individual has standing to pursue TCPA claims even when the calls are not answered, establishing that violations occur even if a call is not answered. *Romero v. Dep't Stores Nat'l Bank*, 725 F. App'x 537, 539 (9th Cir. 2018). And multiple courts have explicitly recognized a plaintiff may assert

Because the TCPA can be violated merely upon the initiation of a call for a prohibited purpose, Defendant's argument that the Court would necessarily have to analyze the contents of each call to determine whether a TCPA violation occurred is incorrect. The relevant question is Defendant's *purpose* in initiating the calls, not what *occurred* on each call. Of course, it is often easiest to determine the purpose of a call by looking at a call's contents. But contents are not the only way.

The fact that a violation may occur regardless of a call's contents is illustrated by a decision from the Eighth Circuit. There, the plaintiffs "received two unsolicited, prerecorded messages on their home phone line."[8] *Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 816 (8th Cir. 2015). Those calls were part of a promotional campaign for a movie. The messages, stated in full, "Liberty. This is a public survey call. We may call back later." *Id.* The plaintiffs sued for violations of the TCPA but the district court concluded the plaintiffs had not "suffered an injury in fact because none of the messages they had received contained an advertisement, telemarketing message, or telephone solicitation, in violation of the [TCPA]." *Id.* at 819. The Eighth Circuit disagreed.

In the Eighth Circuit's view, the TCPA's regulations meant the "content of the calls controlled whether they were 'advertisements'" but the calls' "purpose controlled whether they were 'telemarketing.'" *Id.* at 820. While the defendant argued a court "should consider only the content of the calls in determining whether they were 'telemarketing,'" the Eighth Circuit determined the regulations did not require such an approach. Instead,

---

a TCPA violation for unanswered calls. *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015), *reversed on other grounds*, 894 F.3d 473 (2d Cir. 2018) ("[Defendant] violated the statute each time it placed a call using its [automatic dialer] without consent, regardless of whether the call was answered by a person, a machine, or not at all."); *Fillichio v. M.R.S. Assocs., Inc.*, No. 09-61629-CIV, 2010 WL 4261442, at *3 (S.D. Fla. Oct. 19, 2010) ("[T]he prohibition in the TCPA applies to phone calls placed to cellular telephone numbers even if the intended recipient does not answer the calls. It is the mere act of placing the call that triggers the statute.").

[8] Because the call was not to a cellular telephone line, the particular TCPA provision at issue was different than what is at issue in the current case. However, the meaning of "telemarketing" is the same regardless of which provision is at issue.

- 17 -

the regulations defined "telemarketing" such that it "occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services." *Id.* at 820. And because the "context of the calls" indicated they were for the purpose of promoting a movie, "they qualified as 'telemarketing' even though the messages never referenced the film." *Id.* Thus, the TCPA had been violated based solely on the purpose for which the calls were placed.

Returning to the present case, Defendant's repeated insistence that the Court must look to the content of each call to determine whether each call was "telemarketing" is simply incorrect. As set out by the Eighth Circuit, it is the purpose behind a call that controls, not what happened during the call. And as noted by the Ninth Circuit in approaching a similar issue under the TCPA, courts should "approach the problem" of determining why calls were made "with a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

Based on the controlling legal framework, Defendant's purpose in making calls under the two campaigns presents a common question that is susceptible to being resolved using common evidence. Given the training provided to CDT members and the way they were compensated, Plaintiff may be able to prove there was a common purpose in making each of the calls. Indeed, based on the present evidence, there is a significant likelihood Plaintiff will be able to show the purpose behind the calls in each campaign was to "encourage[e] the purchase" of Defendant's products or services. 47 C.F.R. § 64.1200(f)(12). If Plaintiff can make such a showing, the contents of each call will be irrelevant.

Defendant disagrees with this conclusion and argues "individualized issues will *always* dominate the call purpose inquiry." (Doc. 123 at 14). Defendant cites a number of cases in support of this contention but those cases arose under very different facts and, in any event, appear to misread the TCPA.

Defendant primarily relies on *Newhart v. Quicken Loans Inc.*, as establishing class certification is never appropriate when the content of calls varied. No. 9:15-CV-81250,

2016 WL 7118998 (S.D. Fla. Oct. 12, 2016). In that case, the defendant was a mortgage lender that had called approximately 2,000 borrowers regarding the borrowers' possible participation in the Home Affordable Refinance Program ("HARP"). The plaintiff received nine calls on his cellular telephone and he sued the mortgage lender under the TCPA, alleging the calls constituted prohibited "telemarketing." The plaintiff sought class certification, arguing the calls to all putative class members qualified as "telemarketing" because they were made under an "overall campaign" meant "to encourage borrowers to obtain a HARP refinance loan." *Id.* at *3.

In denying the motion for class certification, the district court noted the calls at issue had been placed for a variety of reasons:

> [T]he purpose of the challenged calls varied from one to the next. Some calls were made in direct response to written and oral requests from borrowers. Such invited calls are not unsolicited telemarking calls 'initiated' for the purpose of marketing a good or service. Other calls were transactional communications to facilitate, complete, or confirm HARP relief that the . . . borrower already had elected to pursue. [Those] calls do not constitute telemarketing because their purpose is not to 'encourage the purchase of any [good or] service.

*Id.* at *4. The court believed "the challenged calls [were] not uniform in purpose" which meant "the telemarketing issue [could not] be resolved by common, classwide evidence." *Id.* At first glance, this decision would appear to help Defendant. But upon a closer examination, it does not.

To begin, the *Newhart* court appears to have operated from an incorrect understanding of the TCPA. As already discussed, the "purpose" for which a call is made does not necessarily turn on the contents of the call. For example, an entity that initiates a call to a cellular telephone with the undisputed purpose of trying to sell a product, has violated the TCPA even if the call is not answered. Similarly, if an entity initiates a call with the undisputed purpose of selling a product, the call is picked up, but the recipient prevents the call from involving discussions regarding the purchase of the product (such as by hanging up immediately), the entity still has violated the TCPA. Accordingly, the

*Newhart* court's belief that the "purpose" of calls must be evaluated based on the content of each call is incorrect.[9]

That being said, the *Newhart* court's decision is understandable because there the defendant offered evidence that many of the calls under the broad "overall campaign" identified by the plaintiff were not "telemarketing" calls. Some of the calls placed under the campaign at issue were calls based on "written and oral requests from borrowers." Those type of calls categorically did not qualify as "telemarketing." Other calls meant merely to confirm the recipient wished to participate in HARP also did not qualify as "telemarketing." Based on evidence establishing varying purposes, the *Newhart* court's conclusion that the purpose of the "overall campaign" could not be determined using common evidence was reasonable. In the present case, however, Defendant has not offered any *specific* evidence of calls under the two campaigns that were not initiated for the purpose of telemarketing. Instead, all the available evidence is that the calls were handled by CDT members and those individuals were hired to work as salespeople, were trained to work as salespeople, were evaluated based on their ability to sell, and were compensated based on the amount of sales they made. Unlike the *Newhart* court, there is significant evidence here that the calls initiated under the two campaigns were initiated for telemarketing purposes. At present, the question of the calls' purpose presents a question that can be resolved by common evidence. And that question is more important than almost any other issue.

### ii.    What Lines Qualify for Protection Under the TCPA?

In arguing that common questions do not predominate, Defendant also argues the proposed class raises individual questions regarding the TCPA's application to particular telephone lines. According to Defendant, the TCPA does not apply to "business telephone

---

[9] The other cases cited by Defendant seem to suffer from a similar flaw. Those cases involve discussions premised on the erroneous belief that the TCPA can only be violated based upon the calls' contents. Thus, neither the decision in *Jacobs v. Quicken Loans, Inc.*, 2017 WL 4838567 (S.D. Fla. Oct. 19, 2017) nor *Fitzhenry v. ADT Corp.*, 2014 WL 6663379 (S.D. Fla. Nov. 3, 2014), is helpful for assessing the request for class certification in the present case.

lines" and the Court would have to conduct individualized inquiries to determine whether each phone number Defendant called was a "business line." This argument is based on another misunderstanding of the TCPA.

To understand why Defendant's argument is baseless, one need only read the relevant portions of the TCPA. The TCPA can be thought of as containing two distinct prohibitions. Both prohibitions are found in 47 U.S.C. § 227(b)(1), which provides, in relevant part:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States--
>
> (A) to make any call . . . using any automatic telephone dialing system . . .
>
> (iii) to any telephone number assigned to a . . . cellular telephone service.
>
> (B) To initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.

The first prohibition, which can be referred to as the "(b)(1)(A) prohibition," makes it unlawful to "make any call" to a cellular telephone using an automatic telephone dialing system. The second prohibition, which can be referred to as the "(b)(1)(B) prohibition," makes it unlawful to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice." Thus, the (b)(1)(A) and (b)(1)(B) prohibitions are very different. Whether a telephone line was a "residential line" is relevant for purposes of the (b)(1)(B) prohibition but irrelevant for purposes of the (b)(1)(A) prohibition. There simply is no basis in the statutory text to conclude the (b)(1)(A) prohibition turns on whether the cellular line belonged to an individual or a business.

Defendant ignores the actual text of the TCPA and claims, as a general matter, the TCPA does not apply to a "business telephone line." (Doc. 123 at 23). In support, Defendant cites cases addressing the application of the (b)(1)(B) prohibition to business

lines.[10]  Those cases are irrelevant because they address the wrong statutory provision. Courts addressing the correct provision have noted use of a cellular telephone line for business purposes has no impact on the applicability of the TCPA.  *See, e.g.*, *Johansen v. GVN Michigan, Inc.*, No. 1:15-CV-00912, 2015 WL 3823036, at *1 (N.D. Ill. June 18, 2015).

Beyond citing inapplicable cases, Defendant also argues the FCC has "declined to extend the TCPA" to cover "all cellular telephone lines."  (Doc. 123 at 24).  This argument is convoluted and incorrect.  In support of its assertion that the TCPA does not cover all cellular telephone lines, Defendant cites a regulatory ruling where the FCC created the National Do-Not-Call Registry.  By statute, the FCC was authorized to create a "single national database" containing "a list of telephone numbers of *residential subscribers* who object to receiving telephone solicitations."  47 U.S.C. § 227(c)(3) (emphasis added).  In 2003, the FCC determined the statutory reference to "residential subscribers" should be construed to include cellular telephone lines.  In allowing cellular telephone lines to participate in the Do-Not-Call Registry the FCC noted some cellular telephone lines might not qualify as "residential subscribers":

> As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers."

*Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 68 FR 44144-01.  Defendant reads that brief statement as proof that the FCC has concluded not all cellular telephone lines are subject to the protections of the TCPA as a

---

[10] *Owens v. Starion Energy, Inc.*, No. 3:16-CV-01912 (VAB), 2017 WL 2838075, at *3 (D. Conn. June 30, 2017) (addressing whether TCPA applied to call to landline used for business purposes); *Bank v. Indep. Energy Grp. LLC*, No. 12-CV-1369, 2014 WL 4954618, at *1 (E.D.N.Y. Oct. 2, 2014) (same); *Baker v. Certified Payment Processing*, L.P., No. 16-CV-03002, 2016 WL 3360464, at *3 (C.D. Ill. June 1, 2016) (same); *Clauss v. Legend Sec., Inc.*, No. 4:13-CV-00381-JAJ, 2014 WL 10007080, at *3 (S.D. Iowa Sept. 8, 2014) (same).

general matter.  But Defendant's conclusion is an oversimplification.

The FCC's statement that only some cellular lines are entitled to placement on the Do-Not-Call Registry has nothing to do with the TCPA's general prohibition on telemarketing calls to cellular lines.  The Court is unable to understand why Defendant believes a statement by the FCC regarding application of the Do-Not-Call Registry to cellular telephone lines should be read as amending sections of the TCPA to provide cellular phone lines used for business are not protected as a general matter.  There is nothing in the statutory text, or FCC guidance, that supports Defendant's argument.

If Defendant's calls under the two calling campaigns were for telemarketing purposes, the fact that the cellular lines Defendant called might also have been used for business purposes is irrelevant.  Defendant's claim that the nature of the cellular lines presents "individual questions" is wrong.  In fact, there is neither a common nor individual question that must be answered.  Telemarketing calls to cellular telephone lines are prohibited in the absence of express written consent, even if the cellular telephone lines were used for business.

### iii.    Common Questions Predominate

Viewed together, there are two substantial "common questions."  First, whether the system Defendant used to place the calls qualifies as an "automatic telephone dialing system."  And second, whether the purpose behind the calls was "telemarketing."  Both of these questions can be resolved using common evidence and the resolution of these questions easily predominates over any individualized inquiries, such as the number of calls received.[11]  The first requirement under Rule 23(b)(3) is met.

---

[11] Defendant presents another argument immediately following its "predominance" section that must be addressed.  Defendant argues "class membership cannot be determined from collective evidence."  (Doc. 123 at 25).  Defendant argues its own records are often inaccurate and it would be inordinately difficult to determine who received the allegedly prohibited telemarketing calls.  It is not entirely clear what requirement of Rule 23 this argument is aimed at as there is no requirement in Rule 23 that class membership be easily ascertainable.  To the extent the Court can understand this argument, Defendant seems to believe Plaintiff must offer a simple way of identifying each and every class member before a class can be certified.  Defendant is wrong.

- 23 -

**B. Superiority**

In addition to requiring that common questions predominate over individual questions, "Rule 23(b)(3) also requires that class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998). *Id.* Sometimes labeled the "superiority inquiry," this "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Id.*

Rule 23 itself "provides a non-exhaustive list of factors" a court should consider when conducting its superiority inquiry. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 713 (9th Cir. 2010). Those factors include "the class members' interests in individually controlling the prosecution . . . of separate actions," any other pending litigation, whether concentrating the claims in a particular forum would be advantageous, and "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). These factors should be considered, along with "other, non-listed factors" in conducting a "broad inquiry" into determining whether a class action is preferable to other possibilities. *Bateman*, 623 F.3d at 713.

Dealing first with the listed factors, the present record establishes class members lack a substantial interest in individually controlling the prosecution of their claims. The

---

In *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017), the defendant argued that in addition to the requirements listed in Rule 23, a plaintiff "must also demonstrate that there is an administratively feasible way to determine who is in the class." The Ninth Circuit rejected that position and held "the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification." *Id.* at 1133. In the Ninth Circuit's view, if there will be problems identifying class members, notifying class members, or assessing the veracity of individuals claiming to be class members, all those issues should be addressed after certification.

Applying the logic of *Briseno* to the present case makes short work of Defendant's argument regarding difficulties identifying class members. While Defendant believes it will be difficult to identify the class members, that possible difficulty is not a valid basis on which to deny class certification. Difficulties in identifying or notifying class members can be addressed later once it is known whether such difficulties even exist.

amount of damages available to a single individual is low and for many people a possible award of even the maximum amount of statutory damages would not be enough of an incentive to pursue litigation. In addition, the parties have not identified any other pending litigation involving similar claims and concentrating the claims in Arizona is appropriate given that Arizona is where, in Defendant's words, "[t]he events giving rise to this action occurred." (Doc. 18 at 14). Finally, this case will not present any special difficulty in case management should it proceed as a class action. Thus, the basic considerations under the superiority inquiry support certification. Defendant presents a number of "superiority" arguments that do not fall cleanly under the usual considerations but none of them have merit.

Defendant first argues a class action is not superior because Plaintiff's proposed class definition is fatally underinclusive. Defendant contends that if every call made by CDT members qualified as "telemarketing," there is no reason to limit the class to the two marketing campaigns identified in Plaintiff's proposed class definition. Defendant fears it will "potentially face dozens of class action lawsuits seeking to impose liability" for the same time period but involving different campaigns. (Doc. 123 at 30). Defendant does not cite any authority requiring certification of the broadest possible class. The fact that other interested parties might sue Defendant for similar misconduct during the same time period is not a basis for concluding *this* case should not proceed as a class action.

Defendant next argues the TCPA was meant only to provide "a cost-efficient remedy for individual plaintiffs." (Doc. 123 at 31). Thus, Defendant believes the Court should enforce the alleged original intent of the TCPA by requiring the ██████ putative class members file independent suits in "small claims courts across the country." (Doc. 123 at 32). This argument is very close to frivolous. There is nothing in the text of the TCPA indicating class actions are not appropriate. When Congress wishes to preclude class actions, it knows how to do so. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 87 (2006) (noting Securities Litigation Uniform Standards Act of 1998 "denies plaintiffs the right to use the class-action device to vindicate certain claims"). And

the usual rule is that class actions are available absent clear indications Congress meant to preclude them. *See Califano v. Yamasaki*, 442 U.S. 682, 700 (1979). Countless courts have certified classes under the TCPA and if there is, in fact, a per se bar to class certification under the TCPA, it appears no court has discovered it yet. Defendants offer no convincing reason for this Court to be the first.

Defendant's final superiority argument is that requiring individual actions would be better because using the class action device in the present circumstances would be "unconstitutional." In Defendant's view, "the aggregation of statutory damages would result in an excessive and disproportionate damages award." (Doc. 123 at 32). The problem for Defendant is the Ninth Circuit has rejected this exact argument.

In *Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708, 711 (9th Cir. 2010), the plaintiff filed a putative class action based on the defendant allegedly violating a federal statute prohibiting receipts from containing more than the last five digits of a credit card number. The federal statute allowed for the recovery of statutory damages of $100 to $1000 per violation. *Id.* The plaintiff sought certification of a class covering 290,000 violations, meaning there was close to $300 million in damages at issue. *Id.* The district court refused to certify a class "because, in its opinion, class treatment could result in enormous liability completely out of proportion to any harm suffered by the plaintiff." *Id.* The Ninth Circuit concluded the extent of a defendant's liability was not a proper factor at the certification stage.

As relevant here, the Ninth Circuit recognized class actions seeking large amounts present unique challenges for defendants. In particular, "class certification may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability." *Id.* at 721. But "the fairness of the pressure i.e., the sociological merits of the small claims class action[,] is not a question for [a court] to decide." *Id.* at 722. The appropriate time a court might intercede on the subject of damages is not at the certification stage but after an award is made. If a plaintiff "prevail[s] at trial, the district court may be entitled to reduce the award if it is unconstitutionally excessive."

*Id.* at 723.  It is not, however, "appropriate to evaluate the excessiveness of [an] award at" the class certification stage.  *Id.*

Defendant cites *Bateman* but apparently does not realize it forecloses its arguments regarding the potentially large damages at issue.  Using the maximum possible statutory damage award for each class member, Defendant could be liable for over ███████ in damages.  That amount of damages might be cause for concern and, if Defendant is found liable, the appropriate amount of damages will have to be examined.  But, as stated in *Bateman*, it is premature to do so now.  Class certification will not be denied merely because, should Defendant eventually lose, its liability exposure will be substantial.

Overall, the "superiority" inquiry comes down to whether it is better to have a single class action seeking relief on behalf of ██████ individuals or some other, unidentified alternative.  Realistically, the only alternative is for Defendant to avoid effectively all liability for its actions.  *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (noting the "*realistic* alternative to a class action is not 17 million individual suits, but zero individual suits").  A class action is far superior to the alternative of most of the allegedly harmed individuals obtaining no relief.

### III.  Conclusion on Rule 23(b)(3) Certification

Plaintiff has met the four requirements of Rule 23(a) as well as the requirements of Rule 23(b)(3).[12]  These determinations are preliminary and do not establish Plaintiff will prevail on the merits.  *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 479 n.9 (2013) (noting class "certifications are not frozen once made" and classes can be decertified "based on circumstances developing as the case unfolds").  Additional

---

[12] Plaintiff also seeks certification under Federal Rule of Civil Procedure 23(b)(2).  Because that request appears to be made only in the alternative in the event certification under Rule 23(b)(3) were to be denied, that request will be denied as moot.  Defendant also moves to exclude a report from Plaintiff's expert.  Because evidence need not be admissible at the class certification stage, Defendant's arguments regarding the admissibility of the expert's report are misplaced.  In any event, the Court did not rely on the expert's report in conducting its analysis.  Therefore, Defendant's request to exclude the expert will be denied as moot.

evidence might surface establishing certification was inappropriate. But "[n]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies Rule 23." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004-05 (9th Cir. 2018).

## IV. Appointment of Class Counsel

Rule 23(g) requires the Court appoint class counsel. To determine whether appointment of Plaintiff's current counsel would be appropriate, the Court must consider "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court also "must" determine that counsel will "fairly and adequately represent the interests of the class." Fed. R. Civ. 23(g)(4). Finally, the Court "may" consider "another other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Plaintiff's counsel has completed a large amount of discovery, presented significant evidence in support of the class's claims, and has expended substantial resources in pursuing this litigation. Counsel appears willing to expend the additional resources necessary to continue this litigation. Counsel's briefing establishes he has extensive knowledge regarding the TCPA and its application. And counsel represents he "has experience litigating TCPA class actions and has been appointed class counsel in previous actions." (Doc. 122 at 20). Defendant offers no reason to believe counsel would be inadequate. Plaintiff's counsel will be appointed as class counsel.

## V. Sealed Filings

This Order cites extensively to filings that are currently under seal. This Order will be filed under seal but the parties will be required to submit a joint statement identifying which portions, if any, of the Order should remain under seal. If the parties agree on the portions to be redacted, the joint statement should be accompanied by a copy of this Order

with the appropriate redactions.  If the parties do not agree, they should submit a motion to seal, accompanied by a copy of the order containing the redactions each side believes necessary as well as a statement identifying the redactions where they do not agree.  In making any redactions, the parties must account for the fact that the standard for sealing Court orders of this type is very high.  *See Opperman v. Path, Inc.*, No. 13-CV-00453-JST, 2017 WL 1036652, at *4 (N.D. Cal. Mar. 17, 2017) (applying "compelling reasons" standard to class certification papers); *Lucas v. Breg, Inc.*, No. 15-CV-00258-BAS-NLS, 2016 WL 5464549, at *1 (S.D. Cal. Sept. 28, 2016) (same).

## VI.    Status Report

The parties will be directed to submit a joint statement outlining their proposals for the remainder of this case.  The joint statement must include proposed dates for the submission by Plaintiff regarding notice to the class, the completion of any additional discovery if necessary, and the filing of dispositive motions.  The parties should keep in mind the Court does not allow for the filing of dispositive motions before a post-discovery status hearing is held and a party planning on filing a dispositive motion is able to articulate a sufficient basis for filing such a motion.

Accordingly,

**IT IS ORDERED** the Motion for Class Certification (Doc. 111) is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 23(b)(3) the following class is certified:

> All persons within the United States to whom, from November 4, 2014 through October 19, 2016, Defendant initiated a call to his or her cellular telephone using an automatic telephone dialing system pursuant to Defendant's "Ad Hoc Marketing 4" call campaign and/or its "US Domain Sales Lead" call campaign.

**IT IS FURTHER ORDERED** John R. Cox is appointed as class counsel.

**IT IS FURTHER ORDERED** no later than **March 29, 2019**, the parties shall submit a joint statement as outlined above regarding the unsealing of this Order.

**IT IS FURTHER ORDERED** no later than **March 29, 2019**, the parties shall file a second joint statement outlining the remainder of this case, including dates for notice to

class members, the completion of all discovery, and dispositive motions.

Dated this 15th day of March, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge

Cc: All Counsel of Record